

FILED by ___JC___ D.C.
ELECTRONIC
DEC 6, 2006
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MARQUIS #4903, LLC
a Florida limited-liability corporation,   **06-22951-CV-LENARD/TORRES**

    Plaintiff,   Case no.

vs.   Judge:

LEVIEV BOYMELGREEN MARQUIS DEVELOPERS, LLC
a Florida limited-liability corporation,

    Defendant.
_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

Through counsel, Marquis #4903, LLC ("**Marquis**") files this amended complaint against Leviev Boymelgreen Marquis Developers, LLC ("**Leviev**") alleging as follows:

### GENERAL ALLEGATIONS

1. Jurisdiction in this court is proper because this action presents a federal question, by asking for a declaratory judgment pertaining to a law of the United States. 28 U.S.C. §§1331 & 2201(a).

2. Venue in this court is proper, because this action pertains to rights and responsibilities under a contract to be performed in Miami-Dade County.

3. All conditions precedent to the institution of this action have been performed, have occurred, or have been waived.

4. Marquis has retained undersigned counsel for legal representation, and it is therefore obligated to pay said counsel a reasonable fee for that representation.

### FACTUAL ALLEGATIONS

5. On March 16, 2005, Marquis and Leviev entered into a contract (the "**Contract**") for the purchase and sale of a unit (the "**Condominium**") in Marquis, a condominium to be constructed

in Miami, Florida (a copy of the Contract is attached hereto and incorporated herein as exhibit "A"). The Contract was subject to the requirements of the Interstate Land Sales Full Disclosure Act ("**ILSA**").

6. The Contract failed to contain an adequate legal description of the Condominium, which would permit Marquis to record the Contract in compliance with ILSA.

7. The Contract was not in recordable format and contained a provision specifically prohibiting Marquis from recording the Contract or any notice or memorandum thereof in the public records of Miami-Dade County (sec. 13(a)).

8. 15 U.S.C. §1703(d)(1) of ILSA states that any contract subject to its requirements which does not provide a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located;...may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement."

9. Marquis is in doubt as to its rights and obligations under the Contract. Therefore, Marquis seeks a declaration from the court as to whether, under ILSA, the Contract contains a sufficient legal description of the Condominium that clearly identifies the property, whether the Contract contains a sufficient description of the property in proper form for recording in order to put the public on notice of the Purchaser's interest in the condominium (i.e. whether the Contract is in recordable format), and whether seller's contractual prohibition of Marquis' recording the Contract is an attempt to evade the provisions of 15 U.S.C. § 1703(d)(1).

10. There is a *bona fide* actual, present, and practical need for this declaration, because Marquis is unsure of its actual rights and obligations under the Contract, and, absent this declaratory action, Marquis will be unable to show any proof of a legal interest in the Condominium. Without being able to do so, the public protection intended to be provided by ILSA will not be satisfied. *Samara Development Corp. v. Marlow*, 556 So.2d 1097, 1100 (Fla. 1990). Furthermore, a seller

may not write provisions into a contract in order to evade ILSA's requirements. *See, Arvida Corp. v. Barnett*, 502 So.2d 11, 13 (Fla. 3rd D.C.A. 1986).

11.   This declaration deals with a present and ascertained or ascertainable state of facts or present controversy as to a state of facts.

12.   Marquis' rights and privileges are dependent upon these facts and the law applicable to these facts.

13.   There are parties who have, or reasonably may have, an actual, present, and adverse interest in the subject matter, either in fact or law.

14.   All such parties are before the court by proper process or class representation, and the relief sought is not merely the giving of legal advice by the court or answers to questions propounded from idle curiosity.

Wherefore, Marquis asks the court to declare whether, Marquis is in doubt as to its rights and obligations under the Contract. Therefore, Marquis seeks a declaration from the court as to whether, under ILSA, the Contract contains a sufficient legal description of the Condominium that clearly identifies the property, whether the Contract contains a sufficient description of the property in proper form for recording in order to put the public on notice of the Purchaser's interest in the condominium (i.e. whether the Contract is in recordable format), and whether seller's contractual prohibition of Marquis' recording the Contract is an attempt to evade the provisions of 15 U.S.C. § 1703(d)(1).

SARAGA & LIPSHY, P.A.

By: _____
Brian Louis Lipshy, Fla. Bar No. 0008930
Joseph Stern, Fla. Bar No. 30902
Attorneys for the Plaintiff
201 NE 1st Avenue
Delray Beach, Florida 33444
Tel: (561) 330-0660, Fax: (561) 330-0610

# MARQUIS, A CONDOMINIUM

## AGREEMENT FOR SALE

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.**

**ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.**

THIS AGREEMENT is between Leviev Boymelgreen Marquis Developers, L.L.C., a Florida limited liability company, with an address at 444 Brickell Avenue, Suite 650, Miami, Florida 33131 (referred to as "Seller" or "Developer") and the party or parties indicated below (referred to as "Buyer").

BUYER(S)

1. MARQUIS #4903, LLC, a Florida limited Liability Co.
2. _____
3. _____
4. _____

Check Applicable: M ☐  S ☐  W ☐  M ☐  F ☐ (repeated four rows)

Buyer Address: 10800 Avenida Del Rio
City: Delray Beach
State/Country: Florida
Zip: 33446
Home Telephone:
Cellular Telephone:
Business Telephone:
Fax Number:
Social Security/Passport No.:
Social Security/Passport No.:
E-mail:

Date of Purchase: **March 16, 2005**;   Unit Purchased: **4903**

In this Agreement the words "I", "me", "my", "mine" and "Buyer" mean Buyer listed above who has signed this Agreement. The words "you", "your", "Seller" and "Developer" mean Leviev Boymelgreen Marquis Developers, L.L.C.. "We" and "our" mean all parties to this Agreement.

This Agreement contains our respective legal rights and obligations concerning the sale by Seller and purchase by me of the condominium unit identified above ("Unit"). I understand that this Agreement is intended to be legally enforceable and binding upon each of us.

1. **Purchase and Sale.** I agree to buy and Seller agrees to sell to me (on terms contained below) the Unit to be located in the City of Miami, County of Miami-Dade, Florida in the proposed condominium known as Marquis, a Condominium ("Condominium"). The Unit and the Condominium are described in greater detail in the proposed Declaration establishing the Condominium. A copy of the Declaration is included in the Prospectus and its exhibits ("Condominium Documents") I have received, which also describes Marquis Condominium Association, Inc. ("Condominium Association"), the entity responsible for the operation of the Condominium, Marquis Master Association, Inc. ("Master Association"), the entity that may be responsible for operation of a portion of the building in which the Condominium is located ("Building"), the hotel parcel owner ("Hotel Parcel Owner") maintaining certain facilities in the Building and the garage parcel owner ("Garage Parcel Owner") maintaining the garage and parking area. The purchase price shall also include the use of one parking space.

I agree to pay the Total Purchase Price by making the following payments in U.S. funds, as follows:

| | |
|---|---:|
| Initial Deposit of 10% received this date, less any reservation deposit of $_____. | $88,000 |
| Additional Deposit of 10% due on or before installation of test pilings. | $88,000 |
| Balance Due at closing of title ("Closing") subject to prorations and adjustments set forth in this Agreement. | $704,000 |
| **TOTAL PURCHASE PRICE** | **$880,000** |

The Total Purchase Price does not include the administrative fee of 1.5% of the Total Purchase Price payable by Buyer to Seller pursuant to Section 9.

2. **Deposits.**

   (a) Deposits shall be made by check subject to collection. The balance due at closing must be paid by wire transfer of U.S. funds to an account designated by Seller. All of the deposits will be held in escrow, except as indicated below, in accordance with the terms of the Escrow Agreement, contained in the Prospectus, with Chicago Title Insurance Company ("Escrow Agent"), whose address is 2701 Gateway Drive, Pompano Beach, Florida 33069.

   (b) Reference in this Agreement to the "deposits" means all of the deposits described in Section 1 and will be understood to automatically include any interest actually earned on such deposits. In other words, whichever party is entitled to the deposits will also be entitled to any interest earned on the deposits, except that, at closing, Buyer will not be entitled to any interest earned. No interest will be assumed to be earned, if not actually earned. Buyer recognizes that if Seller uses any portion of the deposits in construction, or if all or any portion of the deposits are retained in non-interest bearing accounts, no interest will be earned or be deemed to be earned (even if Seller indirectly benefits from any such use or retention). Nothing in this Agreement shall require Seller to place the deposits in an interest bearing account or any account insured by the FDIC. Escrow Agent may place the deposits in a commingled account with other deposits and in such event may use an estimate of the interest earned when making a payment of interest.

   (c) All deposits held in escrow shall be held and disbursed by the Escrow Agent in accordance with (i) the applicable terms and conditions of this Agreement, (ii) the terms and provisions of the Escrow Agreement contained in the Condominium Documents and (iii) the provisions of Chapter 718 of Florida Statutes. Buyer shall be entitled to a receipt for the deposits from Escrow Agent upon request.

   (d) Seller can use all of the deposits in excess of 10% of the Total Purchase Price ("Excess Deposits") for construction, as long as the Excess Deposits are used in a manner consistent with 718.202(3), Florida Statutes. Escrow Agent is authorized to pay the Excess Deposits to Seller for permitted construction purposes without notice to Buyer upon receipt of Seller's request and certification that construction has commenced.

   (e) At closing, all deposits, including all interest earned, not previously disbursed to Seller will be released to Seller. Buyer will be given a credit against the Total Purchase Price for deposits, but will not be given a credit for the interest. If Buyer defaults, Seller is entitled to retain all deposits. If Buyer properly terminates this Agreement in the manner allowed in this Agreement or by applicable law, all deposits will be returned to Buyer within 30 days after the later of the effective date of Buyer's cancellation, or the date Buyer's deposit check clears.

3. **Payment of Purchase Price.**

   (a) I understand and agree that I will be obligated to pay "all cash" at closing. For purposes of this Agreement, "all cash" means immediately available wired federal funds in U.S. Dollars. I understand that my obligation under this Agreement to purchase the Unit will not depend on whether or not I qualify for or obtain a mortgage from any

Agreement for Sale
2

MIAMI 847048.3 7617622257

any lender Buyer chooses and t̶ ordinate closing with such lender, if, but if, such lender meets Seller's closing schedule and pays Seller the proceeds of its mortgage at closing. Should lender not pay Seller its proceeds at closing, Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared.

(b) Although Seller has no obligation to do so, if Seller agrees to delay closing until Buyer's lender is ready, to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees to pay Seller a late funding charge computed at the rate of 18% per annum on all funds due Seller which have not then been paid to Seller (with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance). The foregoing sentence will survive (continue to be effective after) closing. The late funding charge may be estimated by Seller at closing and adjusted thereafter based on actual clearance dates. In the event of any delayed closing, Seller may adjust prorations as of the date the closing was originally scheduled.

4. **Pre-Sales Requirements; Seller's Financing; Effective Date.** I understand that Seller's mortgage lenders may require that a certain number of unit sales be made before Seller obtains financing to construct the Condominium. Seller shall have until 360 days following execution and delivery of this Agreement by Seller and Buyer to satisfy the pre-sales requirement. Seller will not be liable if Seller cannot construct and close on my Unit because of this requirement. If Seller fails to obtain the required number of presales within such period Seller may cancel this Agreement. In that event, I will receive a full refund of the deposits. The fact that Seller may cancel this Agreement does not mean that this Agreement does not become effective until after Seller's mortgage lenders' requirements are met. This Agreement is effective when we both sign and deliver this Agreement to each other and all rights of cancellation contained in this Agreement are "conditions subsequent" (conditions which do not delay the effectiveness of this Agreement). This presale requirement is for the benefit of Seller and may be waived by Seller in Seller's discretion. At closing, Seller may use my purchase money to release my Unit from any mortgage. Because of this, my rights under this Agreement will be subordinate to those of anyone holding a mortgage, including any amendments, modifications, renewals, consolidations and extensions of the mortgage made prior to or after the date of this Agreement.

5. **Condominium Construction Specifications.**

(a) The Unit and the Condominium will be constructed in substantial accordance with the plans and specifications for the Condominium kept in Seller's construction office, as such plans and specifications are amended from time to time. Seller may make any changes in the plans and specifications that it deems appropriate at any time, as long as those changes do not, in Seller's opinion, seriously and adversely affect the market value of the Unit.

(b) Without limiting Seller's general right to make changes, Buyer specifically agrees that changes in the Condominium, including, without limitation, changes in (i) the dimensions of rooms which do not substantially reduce the size of the rooms or changes in terraces, courtyards, common areas, storage spaces, and parking spaces, (ii) the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and (iii) the general layout of the Unit and Condominium, may be made by Seller in its sole and absolute discretion. I acknowledge and agree that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs. These changes and adjustments are essential in order to permit all components of the Unit and the Condominium to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. I acknowledge and agree that it is to my benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium.

(c) I also acknowledge and agree that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not be identical in detail to Seller's plans and specifications, and (ii) because of the day-to-day nature of the changes described in this Section 5, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, we both acknowledge and agree that the Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of Section 13(m), Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with any plans and specifications on file with governmental authorities. Seller has not given and Buyer has not relied on or bargained for any such warranties.

(d) Without limiting generality of the foregoing, because of S r's need to coordinate the appearance and design of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas, and other features of the development, Buyer understands and agrees that the Condominium may be constructed as a reverse ("mirror image") of, or otherwise in a manner different from, that illustrated in the floor and building plan of the building or the Unit (as shown in the Condominium Documents or in any illustrations of the Condominium); and may be "sited" in a position different from that of the floor and building plan (or any such illustrations). Buyer agrees to accept the Condominium and the Unit as "sited" by Seller and as constructed according to a reverse or modified floor and/or building plan.

(e) The Unit will contain a refrigerator/freezer, dishwasher, microwave, cooktop and oven and other items listed as standard features on Seller's sales brochures. I understand and agree that certain other items which may be seen in models or in illustrations, are not included with the sale of the Unit, such as: wall coverings, paint or paint colors (other than off-white), molding, accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, carpets or other floor coverings and colors, wood trim, other upgraded items, terrace treatments (e.g., tile brick, chattachoochee, scored concrete wood trim, or other materials), planters, and any other items of this nature which may be added or deleted by Seller from time to time. This list of items is not all-inclusive, items such as these will not be included in the Unit unless specifically provided for in a published list of standard items (if any) or in a Rider or Schedule to this Agreement signed by both Buyer and Seller. In the event Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay extra for such items.

(f) Certain items which may be included with the Unit, such as tile, cabinets, wood stain, grout, wall and ceiling textures, cultured marble, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's plans and specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller may substitute equipment, material, appliances, etc., with items, which, in Seller's opinion, are of equal or better quality. I also understand and acknowledge that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). I recognize that certain colors as shown in displays or in the models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

(g) Buyer will be given an opportunity prior to closing, on the date and time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Seller and Buyer will sign an inspection statement listing any defects in workmanship or materials solely within the Unit which, in Seller's opinion, are actually defective in workmanship or materials, keeping in mind the construction standards applicable in Miami-Dade County, Florida for similar property. The list of defect or missing items is referred to as a punchlist. Seller will be obligated to correct those punchlist items at its cost after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing. Buyer agrees that Seller shall have access to the Building and to the Unit during normal business hours following closing to correct punchlist items. Seller agrees that, subject to delay beyond Seller's reasonable control, all punchlist items will be corrected within a reasonable time following closing.

(h) Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workmen at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not order any work on the Unit until after closing.

(i) Buyer acknowledges that in designing the Condominium certain areas serve a purely functional purpose and are not intended to have a finished appearance. These areas include stairwells within the Building intended primarily for ingress and egress, and the garage and utility pipes within the Building. These areas may be left unfinished. I also acknowledge and agree that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises and/or odors from adjoining or nearby units and or mechanical equipment can often be detected in other units. Without limiting the generality of Section 13(m), Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among units and the other portions of the Building. Buyer waives and releases any such warranty and claim for loss or damages resulting from sound and/or odor

transmission. I also understand and agree that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Actual square footage of the Unit may also be affected as a result of the field construction changes and other permitted changes to the Unit, as more fully described in this Section. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, I shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from any disclosed to me at any time prior to closing, whether or not included in the Condominium Documents, Seller's promotional materials or otherwise. Without limiting the generality of any other provision of this Agreement, Seller is not making any representation or warranty as to the actual size, dimensions or square footage of the Unit. Buyer waives and releases any such warranty and claim for loss or damages resulting from any variances between any represented or otherwise disclosed square footage and the actual square footage. The agreements and waivers of Buyer contained in this Section will survive (continue to be effective after) closing.

(j)     Every new home contains products that have water, powders, solids and industrial chemicals that are used in constructing the home. The water, powders, solids and industrial chemicals will and do contain mold, mildew, fungus, spores and chemicals which may cause allergic or other bodily reactions in certain individuals. Buyer should consult Buyer's physician to determine the molds, mildews, fungus, spores or chemicals that my adversely affect Buyer or members of Buyer's family.

(k)     LEAKS, WET FLOORING AND MOISTURE WILL CONTRIBUTE TO THE GROWTH OF MOLDS, MILDEWS, FUNGUS OR SPORES. I UNDERSTAND AND AGREE THAT DEVELOPER IS NOT RESPONSIBLE AND I DISCLAIM ANY RESPONSIBILITY FOR, ANY ILLNESS OR ALLERGIC REACTION WHICH I MAY EXPERIENCE AS A RESULT OF MOLD, MILDEW, FUNGUS OR SPORES. I UNDERSTAND AND AGREE THAT IT IS MY RESPONSIBILITY TO KEEP THE UNIT CLEAN, DRY, WELL-VENTILATED AND FREE OF CONTAMINATION.

6.     **Damage Before Closing.** If the Condominium, the Building or my Unit is damaged by fire or other casualty after this Agreement takes effect but before closing, Seller will be financially responsible for the loss, but Seller may decide not to repair the Condominium, the Building, or my Unit. In such event, this Agreement will be canceled; Seller will refund my deposits if I am not in default. Such refund will end any rights or responsibilities we have to each other. If Seller decides to repair the damage, Seller will have a reasonable time to complete repairs. The work will be judged by the same standards used to evaluate new construction. I will have no right to any reduction in the purchase price nor any claim against Seller. I agree to accept title on the scheduled closing date providing the repairs are finished by the closing date. Any money received in settlement of the damage from insurance or otherwise will belong to Seller. If I receive any money in connection with the damage, I will turn it over to Seller immediately.

7.     **Closing Date.**

(a)     I understand that Seller has the right to schedule the date, time and place for closing. Prior to or about the time of closing, however, Seller must (i) record the Declaration and related documents in the public records of the County where the Condominium is located; and (ii) obtain a temporary or final certificate of occupancy or completion for or covering the Unit from the proper governmental agency (the official approval needed before a unit may be lived in). The Common Elements, other portions of the Condominium Property and the balance of the Building need not then have certificates of occupancy, nor be completed.

(b)     I will receive at least 10 days notice of the closing date, time and place. The date set forth in the notice of closing shall be the date utilized for calculation of all prorations and adjustments required by this Agreement. The closing shall be held at an office designated by Seller.

(c)     Seller may, and is authorized to, postpone the closing if a certificate of occupancy for the Unit has not been obtained. If Seller postpones the closing, Seller must give me at least five days' notice of the new date. I agree to close on the date Seller specifies in Seller's notice of postponement. A change of time or place of closing only (one not involving a change of date) shall not require any additional notice period. Any notice of closing, postponement or rescheduling may be given orally, by telephone, telegraph, telex, facsimile, mail, email or other means of communication. All of these notices will be sent or directed to the address, or given by use of the telephone or telex, facsimile number or email specified, on page 1 of this Agreement, unless Seller has received written notice from me of any change prior to the

date the notice is given. These ͵ces will be deemed effective on the date ͵ en or mailed. An affidavit of one of Seller's employees or agents that notice was given to me will be conclusive for purposes of proving that notice was given.

(d) If I fail to receive any notice because I failed to advise Seller of any change of address or telephone, telex or facsimile number, or for any other reason, I will not be relieved of my obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date. I understand that Seller is not required to reschedule or to permit a delay in the closing and any request by me to reschedule a closing will not be effective unless agreed to in writing signed by Seller. I understand that time is of the essence under this Agreement.

(e) Seller agrees to substantially complete construction of the Unit in the manner specified in this Agreement by a date no later than September, 2009, subject however to extensions equal to the period of time of delays caused by acts of God, the unavailability of materials, strikes, other labor problems, governmental orders or other events which would support a defense based upon impossibility of performance for reasons beyond Seller's control.

(f) I agree to deliver at closing an acknowledgment and receipt for the Condominium Documents and a release of Seller's obligations under this Agreement (other than completion of any punchlist items) together with such other documents as may be requested by Seller.

8. **Title to Unit**. Title to the Unit will be conveyed by special warranty deed and will be good, marketable and insurable subject to the following matters ("Permitted Exceptions"):

(a) Liability for all taxes and assessments on my Unit for the year I receive title and for all subsequent years.

(b) Restrictions, covenants, conditions, limitations or easements recorded in the public records. For example, property use limitations, maintenance assessments or rights-of-way for utilities or other services and access others.

(c) Zoning, the major use special permit for this project, the covenant in lieu of unity of title and other restrictions, requirements or prohibitions imposed by governmental authority.

(d) Restrictions, covenants, conditions, terms and other provisions imposed by the recorded Declaration of Condominium and the declaration of covenants and easements and their Exhibits as they may be amended from time to time.

(e) Liens for work, materials or services furnished on behalf of Buyer.

(f) Any mortgage executed or assumed by me that encumbers the Unit.

(g) Matters disclosed by the condominium survey and/or personal inspection and the Condominium Documents.

(h) Pending liens for any public improvements which have not been certified as of the date of this Agreement.

(i) Any lien as provided for by Chapter 159, Florida Statutes, in favor of any town, village or port authority for unpaid service charges by any water, sewer or gas systems supplying the lands described herein.

I understand that nothing affecting title can prohibit the use of my Unit as a residence.

If Seller cannot provide title as described above, Seller will have a reasonable time (at least 60 days) to correct any defects, but Seller is not obligated to do so. If Seller cannot or will not correct the title defects, I will have one of two options: (1) I may accept title in the condition Seller offers it (with defects) and pay the full purchase price for my Unit; if I elect this option, I will not make, nor will I have the right to make, any claims against Seller because of the defects; or (2) I may cancel this Agreement and receive a full refund of all my deposits; if my deposits are refunded, I agree to accept them as full payment of Seller's liability to me and I will not make, and will not have the right to make additional claims against Seller.

Seller will not be required provide me with an abstract of title for my unit. Title to the Unit for all purposes shall conclusively be deemed good, marketable and insurable if Seller is able to deliver ALTA Form "B" owner's title insurance policy insuring the Unit subject only to the Permitted Exceptions within a reasonable time following Closing.

9. **Closing Costs.** I understand that in addition to the purchase price of my Unit and the costs associated with any mortgage I may secure, I must pay certain other fees and "closing costs" when I accept ownership at the closing. Those extra charges include the following:

(a) An administrative fee of 1.5% of the Total Purchase Price. The administrative fee is not for settlement services and is separate from any and all fees imposed by a lender or other closing costs imposed in connection with the purchase of the Unit. The administrative fee represents additional compensation to Seller and principally is intended to cover various out-of-pocket and internal costs and expenses associated with development.

(b) Utility deposits, installation charges or other charges advanced by Seller on my behalf.

(c) All costs for obtaining a mortgage, any amounts for principal, points, interest, taxes, insurance, or private mortgage insurance required by my lender to be paid, prepaid, or escrowed at the closing, the cost of a mortgagee title insurance policy and the costs of any endorsements required by my lender, and any other mortgage loan closing costs of any kind or nature whatsoever imposed by my lender and related charges by Seller for same.

(d) The cost of any obligations I have incurred not provided for in this Agreement.

(e) Pending liens for any public improvements.

(f) Expenses of my Unit such as, taxes, assessments, Condominium maintenance charges, Master Association charges, charges to Garage Parcel Owner and charges to Hotel Parcel Owner, will be prorated between us at closing. If Seller anticipates taxes for the current year will not be separately assessed for my Unit, I will pay Seller a pro rata portion of the real estate taxes for my Unit as estimated by Seller and Seller will pay the real estate taxes for the current year. If Seller anticipates current taxes will be separately assessed for my Unit, Seller will reimburse me for Seller's pro rata share of such taxes upon presentation of a tax bill based upon the maximum discount for early payment, unless the tax bill has been issued or paid by Seller in which event taxes will be prorated at the closing. If real estate taxes are prorated pursuant to this paragraph prior to the issuance of the actual tax bill, there will be no reproration of taxes after the issuance of the bill, even if the actual tax bill is higher or lower than the prior bill. I will also pay Seller any interim or municipal service fees, if any, that are in effect prior to closing for my Unit.

(g) A payment in the amount equal to two monthly payments of assessments to the Condominium Association for expenses incurred to establish and maintain the Condominium Association (which will not be credited against Buyer's obligation for assessments following closing).

(h) A payment to the Hotel Parcel Owner, Garage Parcel Owner and to the Master Association, each in the amount of two monthly payments of the estimated annual assessments allocable to my Unit (which will not be credited against Buyer's obligation for assessments following closing).

(i) A Move-In Fee in the amount of $500.00.

(j) The cost of documentary stamps and recording charges on the deed to Buyer.

(k) The cost of an owner's title insurance policy insuring Buyer's interest in the Unit.

(l) Reimbursement to Seller or Seller's closing agent for charges, if any, incurred in connection with coordinating the closing with Buyer and/or Buyer's lender including, without limitation, messenger charges, long distance telephone calls, photocopying and fax charges, a title search and examination fee of $150 and a charge of $795 if Seller's counsel acts as a settlement agent for Buyer's lender.

I have the right to use a title company and a lender of my choice in connection with the purchase of the Unit. If (i) my purchase is an all cash transaction without financing, and I elect to use your approved title company agent, or (ii) the purchase will be financed, and I elect to use your approved lender, Seller agrees to pay the following closing costs:

Agreement for Sale
7

documentary stamps on the deed, premium for an owner's policy of title insurance, and the cost to record the deed. In order to assure that the title work and the loan application process are processed expeditiously, I must select the title company agent and the lender and advise Seller of my selection either simultaneously with the execution of this Agreement or at least 60 days before the estimated closing date.

(1) _____  I elect to use both Seller's approved title company agent and Seller's approved lender.

(2) _____  I intend to purchase the Unit without financing, and elect to use Seller's approved title company agent.

(3) _____  I elect to use a title company agent other than Seller's approved title company agent and/or a lender other than Seller's approved lender.

(4) _____  I shall notify Seller at least 60 days before the estimated closing date of my election of Option (1), (2), or (3) above by delivering written notice to Seller.

If I select Option (1) or (2) above, and the election is made within the time period prescribed above, Seller will pay the documentary stamp taxes on the deed, the premium for the owner's policy of title insurance, and the costs to record the deed. Regardless of whether Seller pays such costs, I will pay all other closing costs including, without limitation, the title search and exam fee, the settlement fee, and all financing costs.

If I elect to use a title company agent other than Seller's approved title company agent, I shall pay a title review fee of $150 to your approved title company to review the title work and requirements of the title company I select in lieu of the title search and exam fee. This fee is in addition to all other closing costs I may pay.

If I elect to use Seller's approved lender, and Seller's approved lender does not approve me for a mortgage loan, I shall have the right to extend the closing date to a date not more than 30 days following receipt of such disapproval ("Disapproval Date"). If I thereafter make application to a different lender designated by Seller, and I am subsequently approved by the new lender within 30 days from the Disapproval Date, Seller will pay the documentary stamp taxes on the deed, the premium for the owner's policy of title insurance, and the costs to record the deed at closing.

**10. Default.** If I fail to honor my promises or to perform my duties under this Agreement (including making scheduled deposits and closing when required) I will be in "default." If I am still in default 20 days after receipt of notice of default, Seller may cancel this Agreement. Upon cancellation, all my rights under this Agreement will end and Seller may resell my Unit without any accounting or further notice to me. I also agree that upon my default, Seller may notify the Escrow Agent that I have defaulted, in which event the Escrow Agent will pay to Seller that portion of the deposits equal to the greater ("Default Amount") of (i) 15% of the Total Purchase Price, or (ii) the amount of Seller's damages by reason of any default as set forth in a certificate executed by Seller; the Escrow Agent may rely on Seller's notice and certificate, and shall be under no obligation to make any independent investigation or confirmation of my default. In the event the deposits exceed the Default Amount any excess will be paid by the Escrow Agent to Buyer.

I understand that since Seller has taken my Unit off the market and spent money on sales, advertising and promotion, my default will damage Seller. As compensation for this damage, I authorize Seller to keep that portion of the deposits I have made equal to the Default Amount, or, if not then paid by me, I will pay to Seller the Default Amount as Seller's liquidated and agreed upon damages. Seller agrees not to take any other action against me because of my default.

Any damage or loss that occurs to the Condominium, the Building or my Unit while I am in default will not affect Seller's right to retain the deposits as damages.

In the event Seller fails to honor its promises or to perform its duties under this Agreement, I shall give you written notice specifying such default and if Seller, within 30 days subsequent to receipt of the notice, fails to take such action which would cure the default within a reasonable time after notice, and if I have performed all my obligations under this Agreement, I shall have the right to receive a refund of my deposits and the right to seek actual damages. In addition, if the condominium has been constructed, in lieu of the previously described remedy, I shall have the right to specific performance. I agree that Seller shall not be subject to consequential or punitive damages for seller's default. The provisions of this Section shall be applicable even after termination of this Agreement.

11. **Litigation**. In the event any litigation concerning the interpretation of, or rights or obligations under, this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, paralegal fees and court costs through trial and any all appeals. Only those provisions and disclaimers in this Agreement, which specifically state that they shall have effect after closing, will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

12. **Seller's Use of Condominium Property**. As long as Seller owns a Unit or Units in the Condominium, Seller and Seller's agents may maintain sales offices and models to assist Seller in selling units in the Condominium.

13. **Miscellaneous Provisions**.

   (a) **Agreement not to be recorded**. I will not record, nor permit others on my behalf to record, this Agreement, nor any notice or memorandum, in the Public Records of the County in which the Condominium is located. If I do, I shall be in default. I acknowledge that I have not acquired any right, title, interest, or lien right in the Unit prior to closing and I agree not to file a lis pendens, claim of lien or any other document concerning any dispute which I may subsequently have with Seller concerning or arising out of this Agreement.

   (b) **Sales Commissions**. Seller will pay all sales commissions of Seller's on-site sales personnel who are Seller's agents and not my agents or dual agents. I agree to indemnify and hold Seller harmless from the claims of any other persons claiming a real estate commission (other than any broker described in the signature page) unless Seller has agreed in writing to pay commissions to any other party. As Seller's agents, they owe the duty to both Buyer and Seller, to diligently exercise reasonable skill and care in performance of the agent's duties, a duty of honesty and fair dealing and good faith, and a duty to disclose all facts known to the agent materially affecting the value or desirability of property that are not known to me, or within my diligent attention and observation. Seller's agents are not obligated to reveal to me any confidential information which does not involve such affirmative duties of the agent(s).

   (c) **Notices**. Except with respect to fixing the closing date, any time we are required to notify each other, the notice must be in writing. Written notices must be sent by facsimile, hand delivery, electronic mail (e-mail), air courier (such as DHL or Federal Express) or registered or certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to me may be sent by regular air mail, no return receipt being required). Seller will send written notices to me to the address on page 1. I will send any written notices to Seller at Seller's address on page 1. Either of us can change our address for notices by giving written notice to the other. A change of address notice is effective when it is received. All other notices are effective on the day they are sent.

   (d) **Transfer or Assignment**. I have no right to assign, sell or transfer my interest in this Agreement without Seller's written consent. If I am a corporation, other business entity, trustee or nominee, a transfer of my equitable, beneficial, legal or principal interest will constitute an assignment of this Agreement requiring Seller's consent. Seller's consent may be conditioned in any manner Seller desires, in Seller's sole discretion, including, but not limited to, a condition that I pay to Seller a non-refundable fee for Seller's consent in an amount which Seller may determine in Seller's sole discretion. I understand that Seller may withhold consent to any assignment in its sole discretion. Seller's refusal to consent to an assignment shall not give rise to any claim for any damages against Seller. I agree that prior to closing, I will not list or offer the Unit for sale in any publication, with any broker or listing agency or in any other manner and any such listing or offering will be deemed a default under this Agreement.

   Seller may freely assign, transfer or sell any or all of Seller's rights and obligations under this Agreement. If Seller decides to sell all or any part of the Condominium, Seller may assign or transfer Seller's interest in this Agreement and in the Escrow Agreement referred to in Section 2 and my consent will not be required. If the buyer of all or any part of the Condominium assumes Seller's obligations contained in this Agreement and the Escrow Agreement, Seller will not be liable to me for any acts, omissions or defaults by such buyer and I release the named Seller from any duties, obligations or responsibilities under this Agreement or the Condominium Documents.

   (e) **Others Bound by this Agreement**. If I die or in any way lose legal control of my affairs, this Agreement will bind my heirs and legal representatives. If I am a corporation or other business entity, this Agreement will bind my successors in interest. If I have received Seller's written permission to assign or transfer this Agreement it will bind anyone receiving my interest.

(f) <u>Public Records</u>. authorize Seller to record any documents necessary to establish and operate the Condominium. Seller will file them in the Public Records of the County in which this Condominium is located.

(g) <u>My Right to Cancel</u>.

THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

(h) <u>Florida Law and Venue</u>. Any disputes that develop under this Agreement will be settled according to Florida law, in the courts of Miami-Dade County, without giving effect to principles of conflict of laws, except as specifically preempted by federal law. If any part of this Agreement violates a provision of Florida law, Florida law will control. In that event, however, the remainder of the Agreement will remain in force and effect.

(i) <u>Association Membership</u>. When I close and acquire the Unit, I become a member of the Condominium Association, which is a member of the Master Association, and I will accept the liabilities and obligations of such membership. I will also be subject to those matters described in the declaration of covenants and easements appearing in the Condominium Documents. I understand that Seller may advance money to the associations to permit them to pay for certain of their expenses (for example, insurance premiums, utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the associations and other similar expenses). Seller is entitled to be reimbursed by the associations for all sums so advanced. The associations will reimburse Seller out of assessments paid by me and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the associations. No initial contributions to the Condominium Association may be used for such purposes, however, as long as any guaranty by Seller of the Condominium Association's assessments is in effect.

(j) <u>Entire Agreement</u>. This Agreement contains the entire understanding between us concerning the sale and purchase of the Unit and can only be amended in writing, executed by both of us. Prior agreements, representations, understandings and oral statements not reflected in this Agreement and the Condominium Documents are void and have no effect. I have not relied on them. I have fully reviewed this Agreement and sought all legal and other advice which I deem necessary and agree that no provision in this Agreement shall be more strictly construed against either of us than the other. I acknowledge that this Agreement was negotiated in the English language.

(k) <u>Changes</u>. I agree that the Condominium Documents and other documents delivered to me may be amended by Seller, the Condominium Association or the Master Association in any manner whatsoever. Seller may make changes in such documents in its sole discretion. I will receive a copy of all such amendments that are made. As to these changes, I will have 15 days from the date of receipt of such changes which materially alter or modify the offering of the Condominium in a manner adverse to me in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest. Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest. I will not be permitted to pursue any remedy other than the 15-day cancellation remedy described above (and then only for changes that materially alter and/or modify the offering in a manner adverse to Buyer). If I have the right to cancel this Agreement by reason of a material change in a manner adverse to me, my failure to request cancellation in writing within the 15-day period will mean that I accept the change and waive irrevocably my right to cancel. All rights of cancellation will terminate, if not sooner, then they will cancel absolutely at closing. After closing, I will have no remedy for any changes Seller may make or has made. This Section will survive (continue to be effective) after closing.

(l)     All Parties Liable. If more than one person signs this Agreement as Buyer, each will be equally liable, jointly and severally, for full performance of all duties and obligations under it and Seller can enforce it against each party constituting Buyer, or all of them collectively.

(m)     Warranty. There are no express warranties unless they are stated in writing by Seller. Except to the extent provided by Chapter 718 of the Florida Statutes, Seller disclaims any and all implied warranties of merchantability and fitness as to the Unit, the Condominium or any appurtenances, whether arising from custom, usage, course of trade, statutory or case law, or otherwise. In the event a competent court of law determines that this disclaimer is ineffective, the parties agree that any action brought under implied warranty must be brought within one year from the date of Buyer's closing. This clause shall survive the contemplated closing and the delivery of the deed to Buyer. **CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.**

*No warranties or guaranties are given as to consumer products as defined in 15 U.S.C., Section 2301 et seq. (Magnuson-Moss Warranty Act). Seller has not given and I have not relied on or bargained for any such warranties.*

(n)     Time is of the Essence. I understand that time is of the essence under this Agreement.

(o)     Administrative Fee. If this Agreement is terminated by either of us, I agree to pay a $100 charge to Seller if I do not return the Condominium Documents to Seller in good condition.

(p)     FIRPTA. The parties agree to comply with the Foreign Investment Real Property Tax Act, as amended, and agree that there will be no withholding at closing on account of such Act.

(q)     Radon Disclosure. In accordance with the provisions of Florida Statutes, Section 404.056(8), Seller is required to make and are making the following disclosure: "RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County public health unit." I further acknowledge that Seller has made no representation or warranty concerning geological or environmental matters such as radon gas. I understand that if I require more information concerning this potential risk, the U.S. Environmental Protection Agency and state and local authorities are best equipped to render advice.

(r)     Inducement. I acknowledge that the primary inducement to purchase under this Agreement is the Unit. I understand that my Unit may be completed and the closing scheduled while construction proceeds in other portions of the Building. I understand such construction may give rise to noise and dust. I also understand that construction in adjacent areas may give rise to noise and dust and may result in views from my Unit being blocked and my loss of light and air. I agree to accept the Unit subject to the foregoing factors.

(s)     Condominium Documents. I acknowledge receipt of those documents described as received in the Receipt for Condominium Documents which I have executed. I agree this Agreement is subject to all of the terms, conditions and disclosures set forth in the Condominium Documents. The terms used in this Agreement shall have the same definitions and meanings as those set forth in the Condominium Documents, unless otherwise provided in this Agreement or unless the context otherwise requires.

(t)     Insulation; Energy Efficiency. Pursuant to title 16, Chapter I, Section 460.16 of the Code of Federal Regulations, the type, thickness, and R-value of the insulation materials installed in the construction of my Unit, are set forth below.

IF BUYER (PURCHASER) DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF SIGNING THIS AGREEMENT, THIS AGREEMENT MAY BE REVOKED AT BUYER'S (PURCHASER'S) OPTION FOR TWO (2) YEARS AFTER THE SIGNING OF THIS AGREEMENT.

**ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.**

BUYER'S BROKER:                          BUYER(S)

_____                  _____
                                         Ilya Stein, Manager
                                         4/19/05
                                         _____


                                         SELLER:

                                         LEVIEV BOYMELGREEN MARQUIS DEVELOPERS, L.L.C., a Florida limited liability company

                                         By: _____

## ADDENDUM TO AGREEMENT FOR SALE

This Addendum is being executed as a part of the Agreement for Sale ("Agreement") by and between LEVIEW BOYMELGREEN MARQUIS DEVELOPERS, L.L.C., a Florida limited liability company, as Seller, and MARQUIS #4903, LLC, a Florida limited liability company as Buyer of Unit No. 4903, of Marquis Condominium. The parties further agree as follows:

1) The terms contained herein shall prevail over any conflicting provisions in the Agreement and any riders or addenda thereto, and all references contained herein to "Paragraph" shall refer to those in the Agreement.

2) The balance due at closing may also be paid by cashier's check as well wire transfer.

3) A copy of the floor plan for the Unit is contained in the condominium documents, and a copy of the features list for the Unit is attached as Exhibit "A". The Unit shall be constructed substantially in accordance with said floor plan, and the Unit shall contain the items listed in the feature list.

4) Seller shall give Buyer at least 30 days written notice of the date and time of the pre-closing inspection.

5) Buyer shall be permitted to have a professional consultant or other agent, attend the pre-closing inspection, along with Buyer and Seller's representative, provided that the Buyer give the Seller at least 10 days notice of that Buyer will have said professional consultant.

6) At least 5 days prior to closing and provided that Seller's attorney/title company acts as the settlement agent, Seller shall provide Buyer and Buyer's attorney with a copy of the title insurance commitment, proposed closing documents (excluding closing statement), and hard copies of all exceptions to the title insurance policy. There shall be no additional charge to Buyer for the copies of the exceptions.

7) The title insurance policy provided by Seller, or its agent, to Buyer shall have the standard exceptions regarding the gap, possession and mechanics lien deleted and the exception listed in Paragraph 8 (i) shall be deleted as well.

8) Seller shall furnish to Buyer and Buyer's attorney a copy of the Temporary Certificate of Occupancy for the Unit upon request by Buyer. The Seller shall will make reasonable efforts to provide the Buyer and Buyer's attorney with a copy of the proposed closing statement at least one day prior to the closing.

9) In the event of an "all cash" closing wherein the Seller or Seller's agent acts as the settlement agent, there will be no charge to the Buyer for settlement or closing fee, title examination, or title search above what is indicated in the Agreement.

10) The costs indicated in paragraph 9(1) shall not exceed $150.00 unless there is proof of the actual costs.

11) Seller's sole remedy in the event of Buyer's default shall be the retention of Buyer's deposit

12) Buyer may assign this Agreement without the consent of the Seller to an entity wholly owned and controlled by Buyer

13) All notices furnished by Seller to Buyer shall be sent via certified mail, return receipt requested or by other overnight courier service (such as DHL or Federal Express) with a copy to Buyer's attorney: Jeffrey M. Perlow, Esq./Brian E. Port, Esq., 18901 N.E. 29th Avenue, Suite 100, Aventura, FL 33180.

14) Except as expressly modified by this Addendum, the provisions of the Agreement is hereby ratified and confirmed.

EXECUTED this _____ day of _____, 2005 by:

"Buyer"
MARQUIS #4903, LLC, a Florida limited liability company

By: _____
    Ilya Stein, Manager

"Seller"

LEVIEW BOYMELGREEN
MARQUIS DEVELOPERS, L.L.C.

By: _____

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS
MARQUIS #4903, LLC

### DEFENDANTS
LEVIEV BOYMEL GREEN MARQUIS DEVELOPERS, LLC

(b) County of Residence of First Listed Plaintiff: PALM BEACH
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: MIAMI-DADE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
BRIAN LIPSHY   561-330-0660
SARAGA + LIPSHY, P.A.
201 NE 1ST AVE,
DELRAY BEACH, FL 33444

Attorneys (If Known)

(d) Check County Where Action Arose: ☒ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

06-22951- LENARD/TORRES

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |  / ☐ 365 Personal Injury - Product Liability |  | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws |  | ☐ 460 Deportation |
| ☐ 151 Medicare Act |  / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
|  | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
|  |  | **PERSONAL PROPERTY** |  |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 850 Securities/Commodities/Exchange |
|  | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** |  |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract |  | ☐ 385 Property Damage Product Liability |  | ☐ 862 Black Lung (923) |  |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury |  | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** |  | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
|  |  |  | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** |  |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act |  | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land |  | ☐ 535 Death Penalty |  |  |  |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 550 Civil Rights |  |  |  |
|  | ☐ 446 Amer. w/Disabilities - Other | ☐ 555 Prison Condition |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights |  |  |  |  |

### V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO
JUDGE                          DOCKET NUMBER

### VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): DECLARATORY JUDGMENT AS TO WHETHER A CONTRACT VIOLATES 15 USC §1703, ET AL.

LENGTH OF TRIAL via  1  days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
[signature] for Brian Lipshy

DATE 11/22/06

FOR OFFICE USE ONLY
AMOUNT  350.-   RECEIPT # 957108   IFP